# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF HEAT & FROST INSULATORS & ALLIED WORKERS LOCAL NO. 24,<br><br>Plaintiff,<br><br>v.<br><br>CHESAPEAKE FIRESTOP PRODUCTS, INC.,<br><br>Defendant. | Civil Action No. TDC-16-1116 |

## MEMORANDUM OPINION

Plaintiff International Association of Heat & Frost Insulators & Allied Workers Local No. 24 (the "Union") has filed suit against Defendant Chesapeake Firestop Products, Inc. ("Chesapeake") alleging breaches of a collective bargaining agreement and a settlement agreement. The Union, asserting its right to proceed in federal court under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 (2012), seeks damages based on amounts due and owing under both of these agreements. Pending before the Court is the Union's Motion for Summary Judgment. Chesapeake has failed to file an Opposition to the Motion. For the reasons set forth below, the Motion is GRANTED.

## BACKGROUND

### I. The Collective Bargaining Agreement

The Union is a labor organization that represents employees in Maryland, Virginia, West Virginia, and the District of Columbia. Chesapeake has, in the past, employed workers who were members of the Union. On September 25, 2015, as the termination date of an earlier

collective bargaining agreement between the Union and Chesapeake drew near, the parties[1] entered into a Retroactivity Agreement. The Retroactivity Agreement provided that the parties would "maintain in full force and effect the terms and conditions of the most recent collective bargaining agreement between the parties" until a "successor collective bargaining agreement" could be agreed upon or until either party declared "further negotiations for such successor agreement to be at an impasse." Joint Record ("J.R.") 002. It further stated that any collective bargaining agreement negotiated between the Union and the Insulation Contractors' Association of Washington, D.C. (the "ICA") "shall be applied by the parties hereto as a successor to the parties' current agreement, and shall remain in full force and effect as the collective bargaining agreement between the parties in accordance with the term of such agreement." *Id.* Finally, the Retroactivity Agreement provided that any successor agreement, including an agreement between the Union and the ICA, would be applied "retroactively to October 1, 2015, as if such successor agreement has been negotiated and agreed to on or before that date." *Id.*

On October 1, 2015, as contemplated in the Retroactivity Agreement, the Union and the ICA entered into a collective bargaining agreement for the period from October 1, 2015 to March 31, 2019 (the "ICA Agreement"). Under the ICA Agreement, employers agreed to, as relevant here: (1) deduct union dues from consenting employees in the amount of 3.5 percent of wages plus an additional deduction per hour; (2) make contributions to the National Apprenticeship Fund on behalf of each employee covered by the ICA Agreement; (3) deduct fees from the

---

[1] The signatories to the Retroactivity Agreement were Chesapeake and "Asbestos Workers Local 24." No reference is made to the "International Association of Heat & Frost Insulators & Allied Workers Local 24." Yet the Joint Statement of Undisputed Facts, signed by both parties, refers interchangeably to "the Union" or "Local 24" when referring to both the Union and Asbestos Workers Local 24. In addition, the Union's Business Manager, Lino Cressotti, who submitted a Declaration on behalf of the Union, served in the same role for Asbestos Workers Local 24 and was its signatory on the Retroactivity Agreement. The Court thus concludes that Asbestos Workers Local 24 and the Union are the same entity.

2

paychecks of consenting employees for the Political Action Fund; (4) make contributions to the Heat and Frost Insulators and Asbestos Workers Labor-Management Cooperative Trust ("LMCT") on behalf of each employee covered by the ICA Agreement; (5) remit the union dues, National Apprenticeship Fund contributions, and Political Action Fund fees to the Union by the 15th day of the month following the month in which such hours were worked; and (6) remit the LMCT contributions on a monthly basis. Employers were also required to provide a monthly remittance report listing the names, social security numbers, pay periods, hourly pay rate, gross pay, and amount of union dues deducted of each covered employee. The parties agreed that a "penalty in the amount of eighteen percent (18%)" would be levied in the event an employer made late payments of Union dues or benefits. J.R. 032.

Pursuant to Paragraph 2 of the Retroactivity Agreement, Chesapeake was bound by the provisions of the ICA Agreement applicable to employers. Nevertheless, from January 2016 through December 2016, Chesapeake failed to remit any Union dues, National Apprenticeship Fund contributions, Political Action Fund fees, or LMCT fees.

The Union filed this lawsuit on April 14, 2016. On July 13, 2016, Chesapeake submitted outstanding remittance reports for the months from January 2016 to May 2016. The remittance reports reflect the following amounts owed:

- January 2016: For 648 hours worked by four employees, Chesapeake was required to remit $867.25 in Union dues, $32.40 in LMCT contributions, $32.40 in National Apprenticeship Fund contributions, and $25.92 in Political Action Fund fees.

- February 2016: For 801 hours worked by four employees, Chesapeake was required to remit $1,014.51 in Union dues, $40.05 in LMCT contributions, $40.05 in National Apprenticeship Fund contributions, and $32.04 in Political Action Fund fees.

- March 2016: For 533 hours worked by four employees, Chesapeake was required to remit $713.34 in Union dues, $26.65 in LMCT contributions,

3

$26.65 in National Apprenticeship Fund contributions, and $21.32 in Political Action Fund fees.

- April 2016: For 512 hours worked by four employees, Chesapeake was required to remit $685.24 in Union dues, $25.60 in LMCT contributions, $25.60 in National Apprenticeship Fund contributions, and $20.48 in Political Action Fund fees.

- May 2016: For 533 hours worked by four employees, Chesapeake was required to remit $740.11 in Union dues, $27.65 in LMCT contributions, $27.65 in National Apprenticeship Fund contributions, and $22.12 in Political Action Fund fees.

Despite submitting these reports, Chesapeake did not make any of those payments. On October 21, 2016, Chesapeake submitted remittance reports for June 2016 through October 2016. Those reports reflected that no employees covered by the ICA Agreement worked for Chesapeake during those months.

## II. The Settlement Agreement

Even before the ICA Agreement, Chesapeake had a history of making late payments of Union dues and other contributions under earlier collective bargaining agreements. In August 2015, Chesapeake owed the Union approximately $52,000. Accordingly, on August 17, 2015, Chesapeake and the Union entered into a Settlement Agreement which provided that Chesapeake would pay the Union a total of $26,000 of the total $52,000 balance owed. This amount would be payable in 12 equal monthly installments of $2,166.66, each due on the "15th of each month, beginning in September 2015 and continuing through August 15, 2016." with a 15-day grace period for each payment. J.R. 073. Chesapeake was also required to remain current with required dues reports and payments under the applicable collective bargaining agreement. If Chesapeake missed a dues payment or settlement installment payment, the Union would provide a formal Notice of Default granting Chesapeake an additional 15 days, beyond the initial grace period, to pay. If the default remained unpaid after the 15th day, the Settlement Agreement

4

provided in boldface type that "**all outstanding installments plus the remaining $26,000.00 will become immediately due as well.**" *Id.* The Settlement Agreement further provided that Chesapeake would also be responsible for attorney's fees and costs if the Union had to file a lawsuit to collect unpaid amounts.

Chesapeake never made any of the monthly payments required under the Settlement Agreement. On March 28, 2016, the Union issued a Notice of Default to Chesapeake regarding its "failure to comply with the terms of the Settlement Agreement" resulting from "its failure to make timely dues payments and failing to provide timely dues reports for the time period January 2016 to the present" and its "failure to make monthly installment payments." J.R. 076. Pursuant to Paragraph 5 of the Settlement Agreement, the Notice of Default provided Chesapeake with 15 days to cure the defaults and warned that if Chesapeake failed to provide the missed payments, "the entire outstanding balance of $26,000 will become immediately due as well as all outstanding dues payments," and the Union would seek to recover legal fees and costs in any necessary legal action. *Id.*

### III. The Bond

The ICA Agreement also required employers to post a Union Indemnity Bond or Letter of Credit payable to the Union. The purpose of the bond was to guarantee the employer's obligations to the Union and its members. In the event the Union called the bond or letter of credit to satisfy amounts owed under the ICA Agreement, the parties agreed that bond proceeds would be applied in the following order to the employer's outstanding obligations: "wages, expenses, welfare, pension, apprenticeship funds, dues, check-off, etc." J.R. 007. Chesapeake posted a bond of $25,000.

On June 10, 2016, due to Chesapeake's failure to remit required payments under the ICA Agreement, the Union, the Asbestos Workers Local No. 24 Medical Fund (the "Medical Fund"), the Asbestos Workers Local No. 24 Pension Fund (the "Pension Fund"), and the Asbestos Workers Local No. 24 Apprenticeship Fund (the "Apprenticeship Fund") (collectively, the "Obligees") filed a joint claim on the $25,000 bond posted by Chesapeake pursuant to the ICA Agreement. The Obligees' claims on the $25,000 bond included (1) a claim of unpaid wages for an employee in the amount of $14,009.99; (2) a claim of $28,221.04 owed to the Medical Fund; (3) a claim of $13,543.49 owed to the Pension Fund; (4) a claim of $3,493.48 owed to the Apprenticeship Fund; and (5) the Union's claim of $5,500.66 for dues owed under the ICA Agreement between January 1, 2016 and July 31, 2016. On September 16, 2016, Lexon Insurance Company paid $25,000, representing the total value of the bond, to the Obligees. The Union did not receive any of these funds. Because the ICA Agreement prioritizes payments from the bond to cover wages and amounts owed to welfare funds, and because the unpaid wage and Medical Fund claims collectively amount to more than $25,000, the Union is unlikely to receive any funds from the bond in the future.

## DISCUSSION

The Union asserts that the undisputed evidence demonstrates that Chesapeake is bound by the ICA Agreement, that it breached its obligations under its terms, and that the Union is therefore entitled to judgment in the amount of $4,447.02 in unpaid Union dues and other contributions and $800.46 in interest, for a total of $5,247.48. The Union further asserts that the undisputed facts show that Chesapeake breached the Settlement Agreement such that the Union is entitled to judgment in the amount of $52,000 plus legal fees and costs. Although

Chesapeake, through counsel, agreed to the Joint Statement of Undisputed Facts and the Joint Record, it has not filed a memorandum in opposition to the Union's Motion.

## I. Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II. ICA Agreement

Under section 301 of the LMRA, "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a); *see M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015) ("The LMRA grants federal courts jurisdiction to resolve disputes between employers and labor unions

about collective-bargaining agreements."). Thus, labor organizations may bring "suits for breaches of collective bargaining agreements" under the LMRA, as the Union has done here. *See Marion v. Va. Elec. & Power Co.*, 52 F.3d 86, 88 (4th Cir. 1995). "We interpret collective-bargaining agreements . . . according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *M&G Polymers USA*, 135 S. Ct. at 933. Thus, when a collective bargaining agreement is "clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)).

Because Chesapeake acknowledged that it did not make any payments pursuant to the ICA Agreement, the Union's claims under the ICA Agreement turn on whether the Retroactivity Agreement may be interpreted to subject Chesapeake to the terms of the ICA Agreement. This is a question of contract interpretation. *See Sheet Metal Workers Local 19 v. Keystone Heating & Air Cond.*, 934 F.2d 35, 41 (3d Cir. 1991). In its Amended Answer, Chesapeake denies that Chesapeake agreed, pursuant to the Retroactivity Agreement, to adopt the terms and conditions negotiated between the Union and the ICA as its collective bargaining agreement. The plain language of the Retroactivity Agreement demonstrates otherwise. Paragraph 2 of the Retroactivity Agreement provides that "[t]he parties agree that *any* collective bargaining agreement negotiated between" the Union and the ICA "*shall be applied* by the parties hereto as a successor to the parties' current agreement, and *shall remain in full force and effect* as the collective bargaining agreement between the parties in accordance with the term of such agreement." J.R. 002 (emphasis added). This language could not more clearly state that Chesapeake, which signed the Retroactivity Agreement as a party, is bound by the terms of the ICA Agreement entered into by the Union and the ICA, effective October 1, 2015. Even if this

8

language were deemed to be ambiguous, which it is not, Chesapeake demonstrated its understanding that it was a party bound by the terms of the ICA Agreement by posting the $25,000 bond required by Article I of the ICA Agreement. *See Ariz. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Tr. Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1517-18 (9th Cir. 1985) (stating that "in ascertaining the intent of the parties to a collective bargaining agreement," the trier of fact may give great weight to "the parties' conduct subsequent to contract formation").

Courts have held that agreements such as the Retroactivity Agreement, in which an individual employer agrees to be bound by collective bargaining agreements negotiated between a union and a separate multiemployer bargaining association, are enforceable contracts. *See, e.g., Nat. Labor Relations Bd. v. Baker*, 105 F.3d 647, 1997 WL 5771, at *3 (4th Cir. 1997) (unpublished); *Empl. Painters' Trust v. J & B Finishes*, 77 F.3d 1188, 1190, 1192 (9th Cir. 1996) (per curiam); *Bituminous Coal Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625, 634-35 (D.C. Cir. 1989). The Court has little trouble concluding that the ICA Agreement is enforceable against Chesapeake.

In its Answer, Chesapeake admits that the ICA Agreement requires employers subject to it, on a monthly basis, to deduct and remit Union dues, pay contributions to the National Apprenticeship Fund and the LMCT, and deduct and remit Political Action Fund fees. Chesapeake's failure to make these payments is likewise undisputed. The Court therefore concludes that the Union is entitled to judgment as a matter of law on its claim that Chesapeake materially breached its obligations under the ICA Agreement. The Court will enter summary judgment on behalf of the Union on Count I.

9

As for the amounts owed under the ICA Agreement, Chesapeake's remittance reports, as described in the Joint Statement of Undisputed Fact and discussed above, establish that the Union is entitled to $4,447.03 in past Union dues, LMCT contributions, National Apprenticeship Fund contributions, and Political Action Fund fees, as well as $800.46 in interest, pursuant to the terms of the ICA Agreement. The Court will enter judgment for the Union in the amount of $5,247.49 on Count I.

### III.  Settlement Agreement

Under the LMRA, 29 U.S.C. § 185, federal courts may enforce settlement agreements arising out of collective bargaining agreements. *See Davis v. Bell Atlantic-W. Va., Inc.*, 110 F.3d 245, 249 (4th Cir. 1997); *United Mine Workers of Am. Dist. No. 5 v. Consol. Coal Co.*, 666 F.2d 806, 809 (3d Cir. 1981). In its Amended Answer, Chesapeake admitted that it had "agreed to make 12 equal monthly installments of $2,166.66 and to submit Dues Reports & Payments to the Union," and that the Union issued a notice of default to Chesapeake because of Chesapeake's failure to provide timely dues reports and payments. Am. Ans. ¶¶ 18-19, ECF No. 17. The Court concludes based on these admissions that Chesapeake breached the Settlement Agreement. The Union is therefore entitled to summary judgment on Count II. *See, e,g., Hotel Emps. & Rest. Emps. Intern. Union Welfare/Pension Funds v. Caucus Club, Inc.*, 754 F. Supp. 539, 544 (E.D. Mich. 1991) (granting summary judgment and enforcing a settlement agreement requiring the payment of past contributions based on the employer's admission that it had breached the agreement).

As for the specific amount owed under the Settlement Agreement, the Union has established that it is entitled to the amount of $52,000 plus attorney's fees and costs. The Settlement Agreement states that if a default is not cured within the time provided, "all

outstanding installments plus the remaining $26,000.00 will become immediately due as well." J.R. 073. It is undisputed that Chesapeake never made installment payments pursuant to the Settlement Agreement and failed to cure its default upon notice. Consequently, under the terms of the Settlement Agreement, Chesapeake owes the entire outstanding unpaid amount of $52,000. In addition, the Settlement Agreement provides that Chesapeake will be responsible for legal fees and costs if the Union "has to file a lawsuit to collect" the amounts owed. *Id.* It is undisputed that the Union filed this lawsuit to collect the payments owed under the Settlement Agreement. The Court will therefore enter judgment for the Union on Count II in the amount of $52,000 plus attorney's fees and costs associated with the portion of this case relating to enforcement of the Settlement Agreement.

## IV. Offset

Chesapeake asserted in its Amended Answer that the Union has "received monies paid on its behalf and for its benefit, which were sufficient to partially satisfy the sums sought pursuant to the Settlement Agreement to the extent that any such sums were owed." Am. Ans. ¶ 20. The Union denies that it has received any partial satisfaction. Because Chesapeake did not file an Opposition to the Motion, the Court has no additional information on the basis for Chesapeake's claim. To the extent Chesapeake was referring to the $25,000 bond, Lino Cressotti, the Business Manager for the Union, stated in a sworn Declaration that the Union has not received any of the proceeds. He has further stated that based on the value of claims with priority over the Union's claims, which include a $14,009.99 unpaid wage claim and a $28,221.04 Medical Fund claim, it does not anticipate receiving any portion of that $25,000 to cover unpaid Union dues or contributions to the funds referenced in the remittance reports. Chesapeake has not challenged

11

Cressotti's statements. The Court therefore concludes that the evidence establishes that the Union is entitled to the full amount of damages sought.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment is GRANTED. The Union is awarded a total of $57,247.49 plus attorney's fees and costs. A separate Order shall issue.

Date: April 26, 2017

THEODORE D. CHUANG
United States District Judge